[Crim. No. 14719.   Second Dist., Div. Two.   Feb. 11, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOE GONZALES, Defendant and Appellant.

Joseph Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered following a jury trial that resulted in his conviction of murder and robbery, each of the first degree.

In his opening brief appellant states his contentions as follows:

(1) "The statement made by the deceased to the ambulance driver was not a spontaneous statement;" (2) "the district attorney was guilty of misconduct with respect to cross-examination of the appellant;" (3) "the trial court abused its discretion by allowing into evidence cumulative medical testimony and gruesome pictures of the deceased Ontiveros;" (4) "the trial court erred in allowing the appellant to be impeached by a prior felony;" (5) "the overheard statement of the appellant while he was in custody should have been inadmissible;" and (6) "the verdict should be reversed on the additional ground that the numerous errors have a cumulative effect."

In a supplemental brief appellant urges the further contention that prejudicial error was committed when the trial court refused to excuse a prospective juror for cause and denied appellant's motion for a mistrial made in connection there-

with. We have concluded that none of appellant's contentions is meritorious.

The sufficiency of the evidence to sustain the judgment is not questioned. No useful purpose would be served by detailing it here. A former trial also resulted in appellant's conviction but was reversed on appeal by reason of the retroactive application of the rule enunciated in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. (*People* v. *Gonzales,* 66 Cal.2d 482 [58 Cal.Rptr. 361, 426 P.2d 929].) Due to the presence of the *Aranda* error and the necessity of determining its prejudicial effect, the court in *Gonzales* deviated from the usual rule requiring an appellate court to view the evidence in the light most favorable to the prosecution. (Pages 484-485.) Nevertheless, the presentation set forth in this earlier decision is sufficient for an understanding of the factual background and basic events involved in the instant homicide. Therefore, we shall restrict our recital of the evidence to that which is necessary to a proper understanding of appellant's present contentions.

Appellant fatally stabbed Jesus Ontiveros some time around 10:30 p.m. on the night of July 30, 1965. Within moments thereafter Officer Haner of the Oxnard Police Department received a radio call directing him to the scene. He and his partner arrived only two or three minutes later and summoned an ambulance within approximately the same time period following their arrival. The ambulance arrived within approximately four or five minutes. Officer Haner testified that he spoke to the victim who appeared to be in pain and had difficulty speaking.

Robert Brown, an ambulance driver with 10 years' experience, testified that when he arrived on the scene, he was immediately directed to the victim who was lying on the ground with no one around him. He knelt beside him and said, "Relax now, take it easy. I am the ambulance driver and I am here to help you so just take it easy now and we will do what we can and we will get you out of here." As he began to examine Ontiveros, who appeared to be in pain but not in shock, the latter exclaimed, "Oh, my God, oh, my God, help me. I don't do 'notting,' I don't see dem'. 'Day' chase me. Oh, my God, help me, help me. I run. 'Day' try take my money." He "was repetitious. He said this over and over and over again." At no time was Ontiveros ever asked a question.

In contending that evidence of the statements of Ontiveros was improperly received as evidence of spontaneous

statements, admissible under section 1240 of the Evidence Code, appellant does not argue that the statements were the product of interrogation or solicitation.[1] It is necessarily conceded that these utterances were entirely voluntary and not the result of any influence exerted by Robert Brown. Rather, appellant urges that by reason of the lapse of time and the presence of the police prior to Brown's arrival, "it seems reasonable to assume that the declarant who was involved in this bloody fight and was an active participant had ample opportunity to overcome the excitement of the fight and was afforded the opportunity of fabricating a story, or at least there was a great likelihood the declarant could and would fabricate a story to protect his own personal interests.''

Quite apart from the fact that it is the province of the trial judge, and not that of an appellate court, to resolve the issue here presented, we would be unable to accept appellant's contention. Evidence Code section 1240 provides: ''Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception.'' As indicated by the Law Revision Commission comment thereto: ''Section 1240 is a codification of the existing exception to the hearsay rule for statements made spontaneously under the stress of excitement engendered by the event to which they relate. *Showalter* v. *Western Pacific R.R. Co.,* 16 Cal.2d 460 [106 P.2d 895] (1940).'' In *Showalter* the court stated: ''The rule which we deem to be correct was enunciated in the early case of *People* v. *Vernon,* 35 Cal. 49 [95 Am.Dec. 49]— namely, that declarations which are voluntary and spontaneous and made so near the time of the princip*le* act as to preclude the idea of deliberate design, though not precisely concurrent in point of time therewith, are regarded as contemporaneous and admissible.'' (P. 465.) ''The test so laid down is whether or not the statement is made under such circumstances of physical shock or nervous excitement as to preclude the likelihood of reflection and fabrication.'' (P. 466.) ''[I]n our opinion the rule to be followed is that where a declaration is made under the immediate influence of the occurrence to which it relates and so near the time of that occurrence as to negative any probability of fabrication, said

<hr/>

[1]Apparently the evidence of the statements of Ontiveros was not offered or received on the theory that the statements constituted dying declarations as defined in section 1242 of the Evidence Code.

declaration is admissible. . . . The cases cited hereinabove to the contrary, holding the view that the admissibility of such statements is dependent on proximity of time to the principal event or on the continuation of the occurrence to which they relate, are as a consequence hereby overruled." (P. 467.)

And at pages 468-469: "The basis for this circumstantial probability of trustworthiness is 'that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.' To render them admissible it is required that (1) there must be some occurrence startling enough to produce the nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." (See also *People* v. *Costa*, 40 Cal.2d 160, 168 [252 P.2d 1]; *Lane* v. *Pacific Greyhound Lines*, 26 Cal.2d 575, 581-584 [160 P.2d 21].)

Appellant's reliance upon the decision in *Wiley* v. *Easter*, 203 Cal.App.2d 845 [21 Cal.Rptr. 905], is misplaced. In truth, the contrasting factual picture presented in *Wiley* v. *Easter, supra*, merely serves to point up the propriety of the trial court's ruling in the instant case. In *Wiley*, it appeared that a police officer had interviewed one of the parties to a traffic accident approximately an hour thereafter and at a hospital where she "may well have" received " 'medication for pain'." (P. 853.) In addition, the statement sought to be introduced in *Wiley* actually was not a verbal "declaration" of the party at all but a summary prepared by the officer.[2]

The anguished cries of the fatally wounded victim in the instant case, that were repeated over and over again both at the scene and during the drive to the hospital, clearly support the trial court's determination[3] that they were " 'spontaneous,'

[2]The officer testified, pages 853-854: " 'That is the substance of our conversation. These aren't her direct words, however. Q. You paraphrased them? A. Yes. It is a question and answer portion. I don't read the questions, just more or less the answers.' "

[3]The court summarized the basis for its ruling admitting Mr. Ontiveros' statement and excluding a statement made by the other victim, Mr. Lujano, as follows:

". . . But in my view there is a substantial difference between what was said by Mr. Ontiveros and what was said by Mr. Lujano. What he [Mr. Ontiveros] said was not to a police officer. What he said does not indicate reflection. Mr. Ontiveros' injuries were much more extensive.

'natural,' 'impulsive,' 'generated by an excited feeling which extends without letup or breakdown from the moment of the event they illustrate.'." (6 Wigmore on Evidence (3d ed.) § 1749, p. 139.)

Although we hold that Ontiveros' statement was properly received in evidence, it may also be noted that inasmuch as it was merely cumulative of the evidence introduced by the direct testimony of others, it would not have constituted grounds for reversal even if erroneously received. Juan Lujano, the actual victim of the robbery, testified that after he had fallen to the ground wounded, he heard one of his assailants say, "Kill him, take his billfold and let's go." In addition, one of appellant's group testified that several times he heard his companions saying, "Get the wallet."

■■■ Turning to appellant's contention that the prosecutor was guilty of misconduct during his cross-examination, our observation in *People* v. *Baker*, 207 Cal.App.2d 717, 724 [24 Cal.Rptr. 691], is equally apposite here: "The term 'misconduct' when applied to the act of an attorney implies a dishonest act or an attempt to persuade the court or jury by the use of deceptive or reprehensible methods. [Citation.] In this case, there can be no fair assertion that . . . the prosecutor . . . conducted [himself] in such fashion."

■■■ During appellant's first trial the prosecution had elicited through the testimony of one of appellant's companions evidence that appellant had borrowed a glass cutter earlier in the evening "for the purpose of 'gettin' into some place and get something out of it in town;'" (*People* v. *Gonzales, supra,* 66 Cal.2d 482, 487.) A glass cutter was later found at the scene. Although the court noted, footnote 4, page 487, that testimony relating to an apparent abortive burglary "was received over vigorous objection on the grounds of irrelevancy and undue prejudicial effect," it did not hold that such objection was well taken.

However, apparently in conformity with a policy of extreme caution designed to avoid even the possibility of error

The statements themselves do not appear to be reflecting and you look at those statements and they help [you] understand, I think, what transpired in that time lapse.

"These statements don't suggest that there had been any reflection about what happened. They are not narrative. 'Well, tell me what happened? Well, I was over here and then this fellow came over there.' They are the explosive things which suggest that the intervening period was almost a continuum of the events and that it was the events still speaking in his mind as to these declarations."

upon retrial, the prosecutor at an earlier stage of the instant trial indicated to the court that he would not seek to prove this other plan for criminal endeavor. It is extremely doubtful that such abstention was necessary. Proof that appellant's desire to obtain funds was so great as to cause him to formulate a plan to acquire them through felonious means constituted strong evidence that this intent and purpose to rob existed in his mind at the inception of his fatal assault upon Ontiveros.

The fact that the crimes of burglary and robbery have different elements is not determinative where the prosecution is not seeking to establish the identity of the perpetrator by means of proof that the modus operandi in each of two crimes was sufficiently similar to permit the inference that the perpetrator of the uncharged offense was the perpetrator of the charged offense. (Cf. *People* v. *Haston,* 69 Cal.2d 233, 244-245 et seq. [70 Cal.Rptr. 419, 444 P.2d 91].) The issue here was whether or not the intent to commit theft, manifested by earlier plans for a burglary, remained with appellant when he and his companions assaulted their victims a few minutes after the abandonment of their initial plan and after he had expressly suggested the idea of "rolling someone."

" ' [I]n *People* v. *Peete, supra,* 28 Cal.2d 306 [169 P.2d 924], this court pointed out that "except when it shows merely criminal disposition [citation], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged," and noted that the general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' " (*People* v. *Haston, supra,* 69 Cal.2d 233, 244.)

However, as indicated, the prosecution did not seek to develop this issue upon retrial until appellant had denied that the glass cutter found on the scene was his. He also asserted that despite the fact he and his companions lacked funds with which to purchase gasoline for their car, he was not suffering any particular financial pressure. The prosecution then developed the fact that appellant was delinquent in his child support payments and questioned him concerning any delinquency in his rent payments and in his restaurant account. Appellant was then asked: "Isn't it true that on the afternoon of Friday, July 30, 1965, at the Alarcon residence, that you got a glass cutter to commit a burglary with?"

An objection to this question was promptly interposed and sustained. Appellant's trial counsel apparently was well satisfied with this ruling for he merely stated "Thank you" without requesting that the jury be admonished. From a tactical point of view, counsel's good reason for satisfaction is clear. He had effectively prevented the prosecution from opening up this telling area of inquiry and he certainly had no desire to have his achievement pointed out to the jury.

On appeal, however, appellant now argues that the trial court did not go far enough. He asserts that despite his counsel's decision not to seek any further action by the court, nevertheless the trial judge either should have admonished the prosecution or declared a mistrial, *sua sponte.* We cannot agree. While it might have been better practice for the prosecution, if it had decided, contrary to its original intention, to inquire into the planned criminal offense, to have so advised the trial court and thereby obtained a direct ruling on the issue, its failure so to do certainly does not constitute misconduct.

As pointed out in our previous comments, if such a ruling had been sought, it might well have been adverse to appellant with resulting serious damage to his defense. We are satisfied beyond a reasonable doubt that the record discloses neither misconduct nor prejudicial error. (Cal. Const., art. VI, § 13.) Viewing this one inquiry in its context of seven volumes of reporter's transcript, we find the observations of the court in *People* v. *Roberts,* 40 Cal.2d 483, 490 [254 P.2d 501], equally appropriate here: "Roberts contends that the prosecuting attorney was guilty of misconduct in asking him, on cross-examination, 'You're commonly known in the Fillmore as a peddler of narcotics, are you not?' Defense counsel promptly objected to the question and the objection was sustained. There was no request that the jury be instructed to disregard the question. As indicated above, throughout the trial there appears to have been an atmosphere of fairness which was contributed to by the trial judge and by both counsel. We find nothing in the record to indicate that the asking of the question was anything more than an inadvertence. It should not have been asked but in the circumstances we do not believe that asking the question was prejudicial or can possibly be considered to constitute ground for reversal."

Appellant's third and fourth contentions require no extended discussion. We have examined the medical evidence and the photographs introduced herein and find no abuse of

the discretion vouchsafed to the trial court in such matters. (*People* v. *Talbot,* 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Ray,* 252 Cal.App.2d 932, 956-957 [61 Cal.Rptr. 1].) Evidence Code section 788 expressly provides for impeachment by proof of a prior felony conviction and in the absence of any constitutional invalidity in the prior conviction, and none is asserted here, this form of impeachment has been consistently upheld by our highest court. (Cf. *People* v. *Coffey,* 67 Cal.2d 204, 218-219 [60 Cal.Rptr. 457, 430 P.2d 15].)

Appellant's fifth contention arises from the following circumstance. Officer Vasquez of the Oxnard Police Department testified that after appellant's arrest, the officer entered a certain room in the station in order to complete his log. He did not know that appellant was using a telephone[4] therein and he overheard a portion of his conversation entirely by accident. He at no time asked appellant any questions and gave him no direction or instruction. He heard appellant say in Spanish, "Get rid of that red shirt in the cleaners." Thereafter, appellant noticed Officer Vasquez' presence and said to him, "Can't I even talk to my wife while I'm talking on the telephone?"

Contrary to appellant's assertions, it is quite immaterial whether or not he had been apprised of his constitutional rights in accordance with *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], or *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], prior to this occurrence. Neither *Miranda* nor *Dorado* prohibit the receipt into evidence of statements or confessions that are entirely volunteered without solicitation or interrogation. (*Miranda* v. *Arizona,* p. 478 [16 L.Ed.2d p. 725]; *People* v. *Dorado,* p. 354; *People* v. *Charles,* 66 Cal.2d 330, 342 [57 Cal.Rptr. 745, 425 P.2d 545].) It is not claimed here that Officer Vasquez was acting as an "undercover agent" or eavesdropper or that he in any way induced appellant's statement. (Cf. *People* v. *Arguello,* 63 Cal.2d 566, 571 [47 Cal. Rptr. 485, 407 P.2d 661].)

Appellant's contention regarding the "cumulative effect" of his assigned errors is without merit for we have rejected the premise on which it is based, i.e., that his first five assignments of error were well taken.

Appellant's supplemental contentions regarding the

---

[4]Other officers were standing near appellant but they apparently did not understand Spanish.

manner in which the jury was selected are based upon an incident during the *voire dire* of the prospective jurors. It appears from the record before us that following a luncheon recess, one of the prospective jurors, Tavy Cain, advised the trial judge in open court that he had heard that the pending case was a "retrial." The court promptly interrupted the proceedings to permit the juror to be examined on the matter outside the presence of the other members of the panel.

In chambers, juror Cain informed the court that during the luncheon recess he had heard one of the other prospective jurors remark that the pending case "was a retrial; that is, the defendant was found guilty before and that it was set aside on a technicality." However, as indicated, the proceedings in open court had been suspended after the word "retrial" had been mentioned and no reference was made to the balance of the statement overheard by juror Cain. The court and counsel for both parties questioned juror Cain concerning the effect, if any, the statement he had overheard would have upon his ability to serve as an impartial trier of the fact herein. Following this inquiry, the court denied appellant's challenge of juror Cain for cause and his motion for a mistrial.

Our examination of juror Cain's answers during this inquiry convince us that the trial court properly determined that the juror would be able to disregard the indicated statement regarding the retrial and act impartially and without prejudice or bias. ■ To the extent that the juror, in attempting to speculate on what his "subconscious" reaction might be to the statement he had overhead, gave somewhat inconsistent estimates of his ability, the law is clear that "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. [Citations.]" (*People* v. *Linden,* 52 Cal.2d 1, 22 [338 P.2d 397].)

■ Moreover, even if the court's ruling on appellant's challenge for cause had constituted error, he would be precluded from asserting such error on appeal since it was stipulated during oral argument herein that he had six peremptory challenges remaining when he announced his acceptance of the jury. As stated in *People* v. *Wilkes,* 44 Cal.2d 679, 686 [284 P.2d 481]: "When the jury had been selected, defendants had 11 peremptory challenges which they had not used. Even if the trial judge had erroneously disallowed a challenge

for cause, defendants could not complain that an objectionable juror was forced on them where they could have had him excused by peremptory challenge. [Citations.]'' (See also 29 Cal.Jur.2d, Jury, § 121, p. 657, and cases cited therein.)

■ Appellant's secondary contention that his motion for a mistrial should have been granted finds no support in the record before us. Apparently the only statement heard by the other members of the jury panel was the juror Cain's report that he had heard that the case before the court was a ''retrial.'' Certainly it would be wrong for us to hold as a matter of law that the entire jury panel was automatically disqualified and rendered incapable of reaching a fair and impartial verdict because of this relatively innocuous incident.

Finally, we note that the court's abstract of judgment (Pen. Code, §§ 1213, 1213.5) contains the finding that appellant was armed with a deadly weapon at the time of the commission of each offense of which he was convicted ''within the meaning of Penal Code Sections 969c and 3024.'' Appellant does not challenge the factual basis for this finding and its limitation to section 3024 is correct. That is to say, inasmuch as appellant's use of the deadly weapon was a factor in each of the offenses charged, he was not ''armed . . . under such circumstances as to bring [him] within the operation of . . . Section 12022 of the Penal Code'' (Pen. Code, § 969c) permitting the imposition of an additional, consecutive sentence. (*In re Shull,* 23 Cal.2d 745, 749 [146 P.2d 417].) We need not modify the judgment in order to indicate the inapplicability of section 12022 since any sentence here imposed necessarily would be merged into the life term expressly prescribed for first degree murder. (Pen. Code, §§ 190, 669.)

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 9, 1969.